**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**


**In re: BUFFALO COAL COMPANY, INC.,**

       Debtor,

**JOHN W. TEITZ,** as Chapter 7 Trustee
for **BUFFALO COAL COMPANY, INC.,**

       Appellant,

**v.**                                                                    **Civil Action No. 2:10-CV-130
(BAILEY)**

                                      Bankruptcy Case No. 06-0366
                                      Adv. Proc. No. 08-38

**VIRGINIA ELECTRIC AND POWER
COMPANY, INC., d/b/a DOMINION
VIRGINIA POWER,**

       Appellee.

## <u>MEMORANDUM OPINION AFFIRMING ORDERS OF THE BANKRUPTCY COURT</u>

       Pending before the Court is an appeal by John W. Teitz, the Chapter 7 trustee for

Buffalo Coal Company, Inc. ("Buffalo Coal") (collectively, the "debtor"), challenging the

September 30, 2009, and August 16, 2010, decisions of the United States Bankruptcy

Court for the Northern District of West Virginia in the debtor's adversary proceeding against

Virginia Electric and Power Company, d/b/a Dominion Virginia Power ("Dominion").  In the

September 30, 2009, decision, the bankruptcy court granted summary judgment in favor

of Dominion on the debtor's claim that Dominion is obligated to indemnify the debtor

against environmental reclamation liabilities and other third-party claims.  In the August 16,

2010, decision, the bankruptcy court denied relief on the debtor's breach of contract claims.

1

For the reasons that follow, the Court **AFFIRMS** the decisions of the bankruptcy court.

**BACKGROUND**

I.      **Factual History**

     A.      **Introduction**

Dominion is a publicly-regulated utility, which operates the Mount Storm Power Station (the "Power Station") in Grant County, West Virginia, one of the largest coal-fired power generation facilities in its fleet.  To operate the Power Station, Dominion contracts for coal with third-party suppliers on a regular basis.  For over two decades, Buffalo Coal served as such a supplier.  In fact, Dominion was the ultimate purchaser of in excess of 90% of Buffalo Coal's total coal production.  (R. 95 at 179-80).  Dominion purchased such a large quantity because there was a close proximity between Buffalo Coal's operations and the Power Station.  (R. 224 at 12).

In 2005, Buffalo Coal began experiencing financial difficulties and, as a result, requested that Dominion agree to restructure their contractual relationship to increase the price to be paid by Dominion.  In October 2005, Dominion and Buffalo Coal entered into a new coal supply agreement, which increased the price per ton that Dominion paid to Buffalo Coal.  The agreement also included new default provisions whereby Dominion could terminate the agreement in the event of Buffalo Coal's insolvency or inability to pay its debts when due.  In February 2006, after many efforts to assist Buffalo Coal in becoming financially stable, Dominion exercised its right to early termination.  Whether Dominion had already impliedly waived that right, or was estopped from exercising it, is the issue at the core of this appeal.

## B.     First Supply Agreement

On December 31, 2001, Buffalo Coal entered into a contract with PBS Coals, Inc. ("PBS") to supply coal to Dominion, as a PBS subcontractor (the "PBS Subcontract"). Effective January 1, 2002, Buffalo Coal also entered into a direct coal supply agreement with Dominion (the "First Supply Agreement"), which was to continue through December 31, 2005.  (R. 118 at § 1.2).  By the middle of 2005, however, coal production under the First Supply Agreement became unprofitable.  The contract price for each ton of coal was about $6 less than the cost of its production.

On May 11, 2005, Dominion and Buffalo Coal executed a letter agreement, which modified the First Supply Agreement (R. 102).  Specifically, Dominion agreed to temporarily increase the contract price by $20 per ton and to make a prepayment of $1.5 million on future coal shipments.  (Id. at 1).  In exchange, Buffalo Coal agreed, *inter alia*, to comply with an audit of its financial records and mining operations conducted by an auditor of Dominion's choice.  (Id. at 2).

On June 16, 2005, the two principals of Buffalo Coal, Gerald Ramsburg and Chuck Howdershelt, and the coal company's financial consultant, George Brikis, met with Dominion to discuss the execution of a new coal supply contract.  Ramsburg testified that Rick Coles, the head of Dominion's fuels group, led him to believe that Dominion would assist in Buffalo Coal's transition through its difficult financial situation to allow it to begin production under a new agreement.   Another employee of Dominion's fuels group suggested that Buffalo Coal should consider filing bankruptcy.  However, noting that they had exposure on Buffalo Coal's debts through guarantee agreements and that they had responsibilities to numerous companies, Ramsburg and Howdershelt stated that

3

bankruptcy was not an option.

In the meantime, Dominion hired the accounting firm of KPMG to conduct a full audit of Buffalo Coal's financial condition and a mining expert, Paul Goad of Norwest Corporation, to review Buffalo Coal's mining operations. Goad opined that Buffalo Coal had sufficient reserves to fulfill a supply contract and adequate equipment to reach production goals. KPMG indicated that Buffalo Coal was having difficulty paying its debts as they became due. Both recommended that Dominion increase the contract price. As a result, Dominion determined that it was in its best interest to move forward with a new coal supply agreement. Dominion also determined that it would assist Buffalo Coal in eliminating its exposure under the PBS Coal supply contract. In Dominion's estimation, Buffalo's potential exposure under the PBS Coal contract was about $50 million, and its exposure under the First Supply Agreement was about $38 million.

On July 8, 2005, Dominion and Buffalo Coal executed a second letter agreement, which modified the first letter agreement and the First Supply Agreement. Specifically, Dominion agreed to increase the contract price by $11 per ton. Despite execution of the two letter agreements, however, Dominion continued to demand performance from PBS, which required Buffalo Coal to continue to supply coal to Mount Storm at a lower price than the prices provided in the letter agreements. Notwithstanding the letter agreements, therefore, Buffalo Coal's financial condition worsened.

On August 5, 2005, representatives from Dominion and Buffalo Coal met to negotiate the terms of a new coal supply contract, which would replace all other agreements. The parties reached a "handshake" agreement, whereby Dominion agreed to increase the contract price, agreed to numerous price escalators, and agreed to a 5-year

4

contract for 1 million tons of coal each year.  Both parties believed that the final, written version of the "handshake" agreement would be a document Buffalo Coal could use to obtain financing to resolve its liquidity problems.  In fact, Brikis, Buffalo Coal's financial consultant, assured Dominion that banks were lined up waiting only on Buffalo Coal to execute the new supply agreement.  (See R. 315 at 161).

### C. Second Supply Agreement

On October 27, 2005, Dominion and Buffalo Coal executed the final version of the new supply agreement (the "Second Supply Agreement") (R. 97).  The parties contemporaneously executed a settlement agreement of Buffalo Coal's obligations under the First Supply Agreement (the "Settlement Agreement") (R. 96).  Buffalo Coal agreed to acknowledge that it defaulted under the First Supply Agreement, resulting in $34.8 million of damages to Dominion.  (Id. at 1).  In exchange, Dominion agreed to withhold collection of those damages as long as Buffalo Coal adequately performed under the Second Supply Agreement.  (Id. at §§ 1.1 & 1.2).

The Second Supply Agreement included termination provisions that were not included in the First Supply Agreement.  For example, Article 9.2(a), in conjunction with Articles 9.1(d) and 1.1(c), empowered Dominion to execute an early termination of the Second Supply Agreement based upon Buffalo Coal's insolvency or inability to pay its debts when due.  (See R. 97 at §§ 9.2(a), 9.1(d), & 1.1(c)).

In addition, the Second Supply Agreement contained an indemnification provision in favor of Buffalo Coal.  Specifically, in Article 11.11(b), Dominion agreed to indemnify Buffalo Coal against all claims in any manner arising out of, resulting from, caused by, or in connection with Dominion's performance of the Second Supply Agreement.  (R. 97 at §

5

11.11(b)).

**D.    Termination of the Second Supply Agreement**

On November 3, 2005, having not obtained any bank financing, Buffalo Coal's principals requested an additional $2.2 million advanced payment under the Second Supply Agreement to pay its vendors.  (R. 95 at 293-95).  Edward Roarty, director of commercial fuels at Dominion, refused the request for a prepayment and further stated he was offended that Buffalo Coal would ask for an advance so soon after execution of the Second Supply Agreement, especially considering its assurances that bank financing would be available upon execution.  (Id. at 296-97; R. 315 at 170-71).  Nevertheless, before concluding the meeting, Roarty contacted Komatsu, one of Buffalo Coal's equipment vendors, to assure the vendor that Buffalo Coal and Dominion had entered into a new contract that provided a higher price per ton (R. 95 at 296-97).  Dominion also agreed to arrange for a "zero day payment cycle" so that Buffalo Coal could get quicker payments from Dominion.  (Id. at 298).

Dominion's assistance proved to be of no avail, as Buffalo Coal's financial situation continued to deteriorate.  For example, on February 1, 2006, the operational chips on Buffalo Coal's Komatsu equipment were disabled for nonpayment.  Komatsu demanded $1.1 million to reenable the equipment.  The CDS Family Trust, which leased property to Buffalo Coal and had a lien on nearly all of the company's property, filed a state court complaint for nonpayment of $122,000 in rent.  Guteman Oil, the fuel vendor, was owed about $500,000.  Moreover, Buffalo Coal had trouble making its deliveries of coal after the November meeting.  For example, in December 2005 and January 2006, Buffalo Coal delivered less than 40,000 tons each month, though it had agreed to deliver 60,000 tons

in December and 90,000 tons in January. For the first two weeks of February 2006, Buffalo Coal delivered only 7,800 tons.

On February 14, 2006, Ramsburg and Howdershelt, Buffalo Coal's principals, participated in a telephone conference with Karla Haislip, who replaced Rick Coles as head of Dominion's fuels group. During this conference, Ramsburg believed that he heard Haislip mention something about how Buffalo Coal should consider bankruptcy, and if it filed, there may be some things that Dominion could do to help. Haislip denies ever suggesting to Buffalo Coal that it should file bankruptcy. Nevertheless, after the conference, Ramsburg directed Brikis to go to Dominion's offices in Richmond, Virginia, to discover what Dominion meant by suggesting bankruptcy.

On February 16, 2006, Haislip met with Brikis upon his request and being informed by Buffalo Coal's principals that the meeting was "very important." At the meeting, Brikis discussed a potential bankruptcy filing by Buffalo Coal and outlined the effect of such a proceeding for Buffalo Coal and Dominion. The meeting lasted between two and three hours. Brikis stated that Haislip was attentive, she asked some questions, but she was non-committal. At the end of the meeting, Haislip asked Brikis to summarize in writing what he had presented.

With permission from Howdershelt, Brikis memorialized his summary in a February 20, 2006, email, which outlined "what Buffalo . . . propos[ed] as a role for Dominion/Vepco in the company's Ch. 11 reorganization plan." (R. 14-43 at 1). The e-mail states, *inter alia*, that Buffalo Coal intended to file a Chapter 11 bankruptcy, renegotiate a $10 per ton increase in the contract price of the Second Supply Agreement, and have Dominion serve as Buffalo Coal's debtor-in-possession lender for a $6.5 million loan. (Id. at 1-3). Time was

stated to be "of the essence" in that Buffalo Coal only had a few weeks to identify a bankruptcy lender. (Id. at 2).

David Holden, Dominion's vice president of enterprise risk management, described Brikis' email as "the straw that broke the camel's back:"

> We had been working with Buffalo for, at that point, almost a year. We had prepaid for tons. We had renegotiated the contract. We had entered into a second level agreement to provide a bridge between the initial communication and our negotiation of the Dominion contract executed in October. All of these things to ensure that Buffalo had everything it needed to operate comfortably and profitably right after execution of this agreement in October 2005.
> On February 20th . . . we get a letter or email of Buffalo's intent to file bankruptcy. At that point we have done all we believe humanly possible to support Buffalo and my opinion was we have no obligation to do anything further.
> . . .
> I can tell you my recommendation [to terminate the Second Supply Agreement] was based on the Brikis email which is the straw that broke the camel's back as well as all the activities that had taken place from the beginning of 2005 until February 2006.

(R. 307 at 126-29).

By letter dated February 22, 2006, Dominion terminated its Second Supply Agreement with Buffalo Coal (R. 136). In the letter, Dominion cites Buffalo Coal's insolvency and inability to pay debts when due as the basis for Dominion's early termination. (Id. at 1). Haislip, who signed the termination letter on behalf of Dominion, testified that the Agreement was terminated solely on the grounds of Buffalo Coal's insolvency and inability to pay debts when due, pursuant to Article 9.1(d) of the Second Supply Agreement. (R. 237 at 237).

On February 24, 2006, Buffalo Coal shut down its mining facilities, terminated its employees, and ceased all operations on a permanent basis. (R. 135 at 379-80; R. 12-5

at 21-22). As a result, Buffalo Coal incurred third-party liabilities in the form of claims and demands by the States of West Virginia and Maryland for environmental reclamation. In addition, Dominion made a demand on Buffalo Coal to pay damages under the Second Supply Agreement, which it estimated to be about $56 million, and damages for breach of the Settlement Agreement, which it estimated to be about $32 million.

On March 7, 2006, an attorney for Buffalo Coal responded to Dominion's termination letter and liquidated damages demand. The letter disputed Dominion's termination payment calculation and whether an event of default had occurred. The letter also asserted that Dominion's withholding of payment constituted an event of default and provided Dominion with three days to cure the default.

On March 9, 2006, Dominion filed a suit against Buffalo Coal and its guarantors in the United States District Court for the Eastern District of Virginia. The complaint sought breach of contract damages and payment on guarantees of approximately $88 million under the Second Supply Agreement and the Settlement Agreement.

## II.    Procedural History

On May 5, 2006, Buffalo Coal filed for Chapter 11 bankruptcy, which was converted to a Chapter 7 bankruptcy on June 13, 2007. On September 10, 2007, John W. Teitz (the "Trustee") was appointed as the Chapter 7 trustee to administer Buffalo Coal's bankruptcy estate.

On May 1, 2008, the Trustee filed a complaint against Dominion in the bankruptcy court, commencing the adversary proceeding that is the subject of this appeal. The Trustee amended the complaint on May 27, 2008. The amended complaint contains three counts. Count I alleges that Dominion breached the Second Supply Agreement when it

repuditated the agreement by letter on February 22, 2006, without a prior written demand for performance. Count II alleges that Dominion is obligated to indemnify the debtor against environmental reclamation liabilities and other third-party claims resulting from Dominion's termination of the Second Supply Agreement. Count III alleges that Dominion's termination of the Second Supply Agreement constitutes a breach of the Settlement Agreement. Dominion filed a timely answer to the amended complaint.

On March 27, 2009, Dominion moved for summary judgment on all three counts of the amended complaint. On September 30, 2009, the bankruptcy court granted summary judgment against the Trustee on his indemnification claim (R. 17). In so doing, the bankruptcy court found that the indemnification claim seeks consequential damages which are specifically excluded by the Second Supply Agreement. (Id. at 21-22). As such, the bankruptcy court dismissed the indemnification claim.[1] (Id. at 23). However, the bankruptcy court found that genuine issues of material fact existed regarding whether Dominion waived or was equitably estopped from exercising its right to terminate the Second Supply Agreement based upon Buffalo Coal's insolvency. (Id. at 12-15). Accordingly, the bankruptcy court denied summary judgment on the Trustee's breach of contract claims. (Id. at 22).

The Trustee's breach of contract claims proceeded to an eight-day trial commencing on March 1, 2010. Based upon the evidence adduced at trial, as well as deposition testimony submitted post-trial, the bankruptcy court denied relief on the Trustee's breach

---

[1]This Court previously denied the Trustee's motion for leave to file an interlocutory appeal from the bankruptcy court's dismissal of his indemnification claim. **Teitz v. Virginia Electric Power Company d/b/a Dominion Virginia Power**, Case No. 2:10-MC-1, Order Denying Motion for Leave to Appeal Interlocutory Order (N.D. W.Va. Jan. 8, 2010).

of contract claims (R. 89). In so doing, the bankruptcy court rejected the Trustee's argument that Dominion either impliedly waived, or was estopped from raising, Buffalo Coal's insolvency as a ground for terminating the Second Supply Agreement. (Id. at 10).

With regard to waiver, the bankruptcy court was unpersuaded that "the Trustee . . . demonstrated clear and convincing evidence that [Dominion] impliedly waived its right to terminate the Second Supply Agreement based on Buffalo Coal's insolvency." (Id.). "Specifically, the court [did] not believe that the Trustee proved waiver . . . because the parties' relationship and expectations as of February 22, 2006, were far different than their relationship and expectations at the time the Second Supply Agreement was executed on October 27, 2005." (Id. at 14).

As for estoppel, the bankruptcy court was likewise unpersuaded that "the Trustee . . . met his burden of showing clear, precise, and unequivocal evidence that DVP is estopped from raising insolvency as an event of default." (Id. at 10). "Specifically regarding estoppel, the Trustee failed to demonstrate that a material fact was falsely represented or concealed." (Id. at 14). Accordingly, the bankruptcy court denied the relief sought in the amended complaint. The debtor now appeals from both decisions.

## DISCUSSION

### I. Standard of Review

#### A. Review of Judgment

Pursuant to Rule 8013 of the Federal Rules of Bankruptcy Procedure, "the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard

shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." Fed. R. Bankr. P. 8013.

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." ***Anderson v. Bessemer City***, 470 U.S. 564, 573 (1985) (quoting ***United States v. United States Gypsum Co.***, 333 U.S. 364, 395 (1948)). With respect to a bankruptcy court's conclusions of law, the appropriate standard of review is *de novo*. *See* ***In re Mitrano***, 409 B.R. 812, 815 (E.D. Va. 2009); ***In re Meredith***, 527 F.3d 372, 375 (4th Cir. 2008); ***Gilbert v. Scratch 'N Smell, Inc.***, 756 F.2d 320 (4th Cir. 1985). In cases where the issues present mixed questions of law and fact, the reviewing court applies the clearly erroneous standard to the factual portion of the inquiry and *de novo* review to the legal conclusions derived from those facts. *See* ***Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond***, 80 F.3d 895, 905 (4th Cir. 1996). Finally, decisions committed to the discretion of the bankruptcy court are reviewed for abuse of discretion. *See* ***In re Morris***, 385 B.R. 823, 828 (E.D. Va. 2008).

### B.    Review of Summary Judgment

The district court sits as an appellate court in bankruptcy pursuant to 28 U.S.C. § 158(a), and reviews a bankruptcy court's summary judgment ruling *de novo*. ***United Rentals v. Angell***, 592 F.3d 525, 530 (4th Cir. 2010).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *see* ***Celotex***

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 250 (1986).  Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial-- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  **Id.** at 250.  In undertaking this inquiry, the Court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion."  **Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.**, 475 U.S. 574, 587 (1986); *see also* **E.E.O.C. v. Navy Federal Credit Union**, 424 F.3d 397, 405 (4th Cir. 2005).

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."  **Matsushita**, 475 U.S. at 586.  That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial.  Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; **Celotex Corp.**, 477 U.S. at 323-25; **Anderson**, 477 U.S. at 248.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  **Anderson**, 477 U.S. at 249 (citations omitted).

II.    **Analysis**

The debtor appeals from two decisions of the bankruptcy court, namely: (1) a September 30, 2009, decision, which granted summary judgment in favor of Dominion on the debtor's claim that Dominion is obligated to indemnify the debtor against environmental reclamation liabilities and other third-party claims; and (2) an August 16, 2010, decision,

13

which denied relief on the debtor's breach of contract claims. This Court will now consider the debtor's claims of error beginning with the latter decision.

### A.    August 16, 2010, Decision

The debtor asserts three claims of error with regard to the August 16, 2010, decision: (1) that the bankruptcy court made improper factual determinations and otherwise erred in failing to determine that Dominion waived or should be estopped from terminating the Second Supply Agreement based upon the debtor's financial condition; (2) that the bankruptcy court erred in dismissing its claim for breach of the parties' Settlement Agreement, when the evidence showed that Dominion breached the Second Supply Agreement and thereby prevented the debtor from fully performing under the Settlement Agreement; and (3) that the bankruptcy court erred in failing to consider proffered deposition testimony and exhibits to which Dominion objected. This Court will now consider each claim or error, in turn.

### 1.    Failure to Find Waiver or Estoppel

The debtor does not contend that the bankruptcy court "relied upon erroneous points of law in reaching its decision." ([Doc. 10] at 25). Rather, the debtor contends that the bankruptcy court "failed to properly apply the legal principles of waiver and estoppel to the facts and evidence adduced at trial." (Id.). Specifically, the debtor argues that the bankruptcy court did not properly consider or give appropriate weight to the clear and convincing evidence adduced by the Trustee establishing that Dominion waived the insolvency/inability to pay debts provision of the Second Supply Agreement and was estopped from relying on that provision to terminate the Agreement.

Under Virginia law, which the parties agree governs, "waiver is the voluntary,

14

intentional abandonment of a known legal right, advantage, or privilege." ***Weidman v. Babcok***, 241 Va. 40, 45, 400 S.E.2d 164, 167 (1991)  The elements of waiver are two-fold: (1) "knowledge of the facts basic to the exercise of the right [waived]" and (2) "the intent to relinquish that right."  ***Stuart's Draft Shopping Center, L.P. v. S-D Assoc.***, 251 Va. 483, 489-90, 468 S.E.2d 885, 889 (1996).  "[W]aiver must be express, or, if it is to be implied, [the intention to waive a right] must be established by clear and convincing evidence." ***Baumann v. Capozio***, 269 Va. 356, 361, 611 S.E.2d 597, 600 (2005).  "Voluntary choice is of the essence of waiver." ***May v. Martin***, 205 Va. 397, 404, 137 S.E.2d 860, 865 (1964). "[S]tanding alone, an obligee's acceptance of less than full performance by the obligor does not prove intent to relinquish the right to enforce full performance."  ***Stanley's Cafeteria, Inc. v. Abramson***, 226 Va. 68, 74, 306 S.E.2d 870, 873 (1983).  Similarly, "although a delay in enforcing a contractual right may show passive acquiescence in a partial performance, that alone does not establish an intent to relinquish the right to full performance."  ***Stuart's Draft***, 251 Va. at 490, 468 S.E.2d at 890.[2]

Estoppel, on the other hand, requires that the following elements be shown "by clear, precise, and unequivocal evidence:"

> (1) A material fact was falsely represented or concealed; (2) The representation or concealment was made with knowledge of the facts; (3) The party to whom the representation was made was ignorant of the truth of the matter; (4) The representation was made with the intention that the other

---

[2]The debtor argues that the bankruptcy court erroneously failed to take into account the case of ***Vecco Construction Indus., Inc. v. Century Construction Co. (In re Vecco Construction Indus., Inc.)***, 30 B.R. 945 (Bankr. E.D. Va. 1983).  This Court disagrees. First, as a bankruptcy court decision, ***Vecco*** is not controlling on Virginia law.  Second, ***Vecco*** predates ***Abramson*** and ***Stuart's Draft***, two Supreme Court of Virginia cases directly on point for the proposition that a delay in exercising contractual remedies cannot be construed as the waiver of those remedies.

party should act upon it; (5) The other party was induced to act upon it; and (6) The party claiming estoppel was misled to his injury.

*Moorman v. Blackstock, Inc.*, 276 Va. 64, 78, 661 S.E.2d 404, 411 (2008). The doctrine of estoppel "is applied rarely and only from necessity." *Princess Anne Hills Civic League v. Susan Constant Real Estate Trust*, 243 Va. 53, 59, 413 S.E.2d 599, 603 (1992).

### i.    Dominion's Awareness of Financial Condition at Execution

First, the debtor argues that the bankruptcy court improperly failed to consider the clear and convincing evidence that Dominion was knowledgeable about the debtor's financial condition and specifically knew that the debtor was insolvent and unable to pay its debts when due as of the date the Second Supply Agreement was executed.

For example, the debtor argues that "[t]he single, most compelling evidence of waiver and estoppel on the part of [Dominion]," which the bankruptcy court failed to properly consider, was Haislip's trial testimony. ([Doc. 10] at 27). Haislip testified that Dominion had the right to terminate the Second Supply Agreement upon execution and thereafter but chose not to exercise such right:

> Q.    If Buffalo is insolvent, however evidenced, or is unable to pay its debts when due, that is an event of default; is that correct?
> A.    That is an event of default that we have a right to exercise. And we had a right to exercise it on the day we signed the contract and had the right to exercise that on the day we terminated the contract.

(R. 180 at 2266).

Haislip also testified that, as part of a conscious "business decision," Dominion "elected not to terminate" the Second Supply Agreement at the time of its execution. (Id. at 2275-76). Additionally, the debtor cites other items of evidence indicating Dominion's knowledge of the debtor's insolvency upon execution of the Second Supply Agreement,

including that the debtor had been fully audited at Dominion's request. (See [Doc. 10] at 29-30).

In its decision, the bankruptcy court recognized Haislip's testimony as a factual assertion offered in support of a finding of waiver or estoppel. (See R. 89 at 9). The debtor, nevertheless, argues it was clearly erroneous for the bankruptcy court not to "make any specific findings as to why [Haislip's testimony] does not constitute waiver and/or estoppel on Dominion's behalf." ([Doc. 10] at 28). The bankruptcy court also recognized the other evidence of Dominion's awareness of the debtor's insolvency. (See R. 89 at 9-10). The debtor argues, however, that the bankruptcy court failed to attribute proper weight to that evidence.

Upon careful consideration of the above, this Court finds no clear error in the bankruptcy court's consideration of the Haislip testimony or the other evidence adduced at trial tending to prove Dominion was long aware of the debtor's insolvency. The bankruptcy court specifically addressed the fact that Dominion could have terminated the Second Supply Agreement at any time after its execution but elected not to do so until February 2006. Instead of classifying that election as a waiver or an act triggering estoppel, the bankruptcy court found that though "[b]oth parties knew of Buffalo Coal's financial distress, . . . the execution of the Second Supply Agreement . . . was meant to be a stepping stone in Buffalo Coal's return to financial health and adequate time had to be allowed for Buffalo Coal to embark on that recovery." (R. 89 at 13). In other words, the bankruptcy court concluded that Dominion's decision not to exercise its termination rights

until February 2006, was better described as an exercise of good faith[3] to allow the debtor the opportunity to again become financially stable. It was only when the debtor asked to renegotiate a four-month-old agreement or agree to provide debtor-in-possession financing that Dominion, seeing no hope for recovery, properly elected to exercise its bargained-for termination rights. This Court agrees.

Applying the law of waiver, the bankruptcy court correctly found that Dominion's early and continuing knowledge of insolvency failed to constitute an implied waiver of the early termination rights. In so finding, the bankruptcy court was merely recognizing that there are *two* elements of waiver, both equally necessary. Dominion must have had more than merely the knowledge that the debtor was insolvent; Dominion must have also manifested its intent to relinquish its right to terminate based upon that insolvency. *See Stuart's Draft*, 468 S.E.2d at 889. That Dominion executed the Second Supply Agreement in the face of the debtor's insolvency cannot, standing alone, constitute a manifestation of an intent to relinquish Dominion's right to ever terminate based upon insolvency. *See Lasalle National Bank v. Metropolitan Life Ins. Co.*, 1993 WL 191803, *2 (N.D. Ill. June 4, 1993) ("[E]xecution of the contract is consistent with an intention to rely on its conditions, not an intention to waive them. It is anomalous to contend that a condition, clearly provided for in the contract, was waived when the parties executed the contract."); *MaceRich Real*

---

[3]The debtor argues that the bankruptcy court erroneously "injected an element of 'good faith' into the Trustee's burden of proof." ([Doc. 10] at 26). This Court disagrees with the debtor's characterization. Instead, this Court finds that the bankruptcy court was correctly considering Dominion's intent, as controlling waiver law requires. *See Stuart's Draft*, 468 S.E.2d at 889. Thus, this Court finds that the bankruptcy court merely used the term "good faith" as a descriptor of Dominion's intent, concluding correctly that Dominion never intended to relinquish its right to early termination based upon insolvency.

*Estate Co. VI v. Holland Properties Co.*, 454 F.Supp. 891, 898 (D. Colo. 1978) ("It strains credulity to believe that the signatory of a contract would expect, or receive, a waiver of a vital term in a contract executed just moments before."). In fact, Haislip testified that Dominion would never have entered into the Second Supply Agreement without the insolvency provision. (See R. 180 at 2014). Moreover, that Dominion may have delayed in enforcing its right to early termination cannot alone constitute a waiver of that right. *See Stuart's Draft*, 468 S.E.2d at 890. Therefore, this Court agrees with the bankruptcy court that the debtor failed to establish the intent element of waiver by clear and convincing evidence.

### ii.    Dominion's Agreement Despite Existence of Default

Second, the debtor argues that the bankruptcy court improperly failed to consider clear and convincing evidence that by entering into the Second Supply Agreement despite the existence of default, and thereafter concealing its professed right to terminate unilaterally at any moment of its choosing, Dominion misled the debtor and its creditors to their detriment. This Court disagrees.

Applying the law of estoppel, the bankruptcy court correctly found that the debtor failed to demonstrate that a material fact was falsely represented or concealed. More specifically, the bankruptcy court accurately described the record as "devoid of evidence sufficient to establish that [Dominion] lured [the debtor] into executing the Second Supply Agreement, all the while harboring a surreptitious intent to unilaterally or arbitrarily terminate the Agreement." (R. 89 at 14).

Instead, the record shows that at no time did Dominion represent that it would never exercise its right to terminate based upon insolvency, nor did Dominion ever conceal from

19

the debtor that it could. Beginning with negotiations for the Second Supply Agreement, the debtor was well aware that Dominion insisted on the new agreement including safeguards that would protect Dominion. (See R. 135 at 465-468). The debtor, represented by counsel, agreed to be bound by the terms and conditions of the Second Supply Agreement, including its early termination provisions. (See R. 154 at 974). At no time did Dominion represent to the debtor that it would not enforce any term or condition of the Second Supply Agreement. (See Id. at 975-76). There is no evidence of false representation or concealment. As stated above, Dominion entered into the Second Supply Agreement with a hope that the debtor would rise out of its financial instability; it was only when that hope faded that Dominion elected to exercise its bargained-for right of early termination. Therefore, this Court agrees with the bankruptcy court that the debtor failed to establish the false representation or concealment element of estoppel by clear, precise, and unequivocal evidence.

Accordingly, for the reasons stated above, this Court finds that the bankruptcy court did not err by failing to find that Dominion impliedly waived, or should be estopped from exercising, their right to terminate the Second Supply Agreement based upon the debtor's insolvency.

### 2. Failure to Find Breach of Settlement Agreement

Next, the debtor contends that the bankruptcy court erred in dismissing its claim for breach of the Settlement Agreement, when the evidence showed that Dominion breached the Second Supply Agreement and thereby prevented the debtor from fully performing under the Settlement Agreement. Specifically, the debtor argues that the bankruptcy court erred by failing to find that Dominion's termination of the Second Supply Agreement

excused the debtor from fulfilling the condition of the Settlement Agreement requiring full performance of the Second Supply Agreement before the indebtedness from the First Supply Agreement would be released. This Court disagrees.

Pursuant to the Settlement Agreement, Dominion agreed to forebear from collecting under the First Supply Agreement as long as the debtor performed under the Second Supply Agreement. (R. 96 at §§ 1.1 & 1.2). It follows, then, that a default by the debtor under the Second Supply Agreement would constitute a default under the Settlement Agreement. Thus, the debtor's claim of error could succeed only if Dominion terminated the Second Supply Agreement unsupport by an event of default by the debtor. However, in light of this Court's ruling above that Dominion properly terminated the Second Supply Agreement based upon the debtor's insolvency, the debtor has no claim for breach of the Settlement Agreement by arguing that the termination was improper. Accordingly, this Court finds that the bankruptcy court did not err in dismissing the debtor's claim for breach of the Settlement Agreement.

### 3. Failure to Consider Evidence to Which Dominion Objected

Finally, the debtor contends that the bankruptcy court abused its discretion by failing to consider proffered deposition testimony and exhibits to which Dominion objected. Specifically, the debtor refers to a footnote wherein the bankruptcy court stated, "In reaching its decision, the court has not relied upon any excerpts from the deposition designations to which either party objected, nor has it relied on any of the disputed deposition exhibits." (R. 89 at 1, n. 1). For the reasons that follow, this Court finds no abuse of discretion.

First, the bankruptcy court did not exclude the deposition testimony and exhibits to

which either party objected.  Distinctly, the bankruptcy court declined to *rely* upon the objected-to evidence in reaching his conclusion. Upon a review of the record, this Court finds that the bankruptcy court had no reason to rely upon the deposition designations because the deposition testimony was cumulative of other evidence that was already admitted into the record.  Even the debtor acknowledges that the challenged deposition testimony would have served only to "*further* demonstrate" Dominion's knowledge of its insolvency by "provid[ing] *additional* substantial evidence" of this knowledge.  (See [Doc. 10] at 41) (emphasis added).

Second, in its decision, the bankruptcy court recognized that Dominion had knowledge of the debtor's insolvency upon execution of the Second Supply Agreement and thereafter.  Nevertheless, the bankruptcy court concluded that Dominion's mere knowledge of insolvency did not constitute waiver without a showing of an intent to relinquish early termination based upon that insolvency.  This Court has already agreed that the debtor failed to prove the intent element of waiver.  As such, the extent to which the objected-to evidence could have satisfied the knowledge element is of no significance.

For these reasons, the Court finds that the bankruptcy court did not abuse its discretion by electing not to rely upon the deposition testimony and exhibits to which Dominion objected.

**B.**     **September 30, 2009, Decision**

The debtor asserts one claim of error with regard to the September 30, 2009, decision.  Specifically, the debtor claims that the bankruptcy court erred in determining that the exclusion of consequential damages in the Second Supply Agreement precluded the debtor's claim under the Agreement's indemnification provision for third-party claims and

22

environmental reclamation. For the reasons described below, this Court finds it unnecessary to decide this issue and that the debtor's indemnification claim otherwise has no merit.

In Count II of its amended complaint, the debtor alleges that as a result of Dominion's termination of the Second Supply Agreement the debtor "incurred and will continue to incur damages, costs, losses, liabilities, expenses and attorneys' fees as a result of claims and demands by the States of West Virginia and Maryland for environmental reclamation." (R. 2 at ¶ 52). The debtor seeks indemnity from Dominion for these expenses pursuant to Article 11.11(b) of the Second Supply Agreement, whereby Dominion agreed to indemnify Buffalo Coal against all claims in any manner arising out of, resulting from, caused by, or in connection with Dominion's performance of the Second Supply Agreement. (Id. at ¶¶ 51, 54). In the decision being challenged, however, the bankruptcy court dismissed Count II as seeking consequential damages excluded under Article 9.7 of the Second Supply Agreement. (R. 17 at 22). The debtor claims this was error.

Even assuming indemnification is not excluded as consequential damages, Count II nevertheless fails on its merits. This is because the debtor's indemnification claim can succeed only if Dominion's termination of the Second Supply Agreement was improper. Specifically, this Court agrees with Dominion that the debtor's indemnification claim is "actually just a re-branding of his failed claim for breach of contract." ([Doc. 11-1] at 13). For example, the debtor asserts in its brief that Dominion owes indemnity under the Second Supply Agreement as a result of Dominion's "improper termination," "abrupt cessation of its performance," and "incomplete performance" of the Agreement. (See [Doc. 10] at 44).

23

These phrases are just other ways of claiming that the debtor incurred third-party liabilities as a result of Dominion's "breach of contract." However, because this Court has already found that the Dominion's termination of the Second Supply Agreement was proper, Count II must fail. Accordingly, this Court finds no reason to reinstate Count II insofar as subsequent rulings have rendered any claim for indemnification without merit.

## CONCLUSION

For the foregoing reasons, the Court finds that the bankruptcy court's decisions should be, and hereby are, **AFFIRMED**. It is further **ORDERED** that this appeal should be, and hereby is, **DISMISSED** and **STRICKEN** from the active docket of this Court.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein and to the Clerk of the United States Bankruptcy Court for the Northern District of West Virginia.

**DATED**: March 8, 2011.


JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE